STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. RE-17-219

SMR, INC.,

      Plaintiff

v.

ORDER

REC'D CUMB CLERKS OFC
MAR 6 '20 AM10:29

CIANBRO CORP., et al.,

      Defendants

Before the court is an application by defendant Cianbro Corporation for attorney's fees and costs.

1. At the outset the parties dispute whether plaintiff SMR's claims were without merit and whether its discovery requests were oppressive. However, the relative merits of SMR's claims and defenses and whether or not SMR's discovery requests were unduly burdensome is not determinative of whether Cianbro is entitled to attorney's fees. Cianbro is entitled to attorney's fees because it prevailed in this case and because its subcontract with SMR provided that Cianbro is entitled to attorney's fees as a prevailing party in a dispute with the subcontractor or if the subcontractor defaulted. Plaintiff's Ex. 1, Subcontract §§ 16.2(f), 19.4, 20.7.

2. To the extent that the issues raised by SMR, the litigation positions that SMR took, and the assiduousness with which SMR pursued its discovery requests required counsel for Cianbro to perform more work, that has necessarily has resulted in an increase in the amount of Cianbro's attorney time and expense for which Cianbro now seeks an award of attorney's fees and costs.

3. In this case Cianbro's defense to SMR's claims and Cianbro's prosecution of its counterclaim against SMR were inextricably intertwined. *See Advanced Construction Corp. v. Pilecki*, 2006 ME 84 ¶ 32, 901 A.2d 189. No distinction can be drawn between the attorney's

**Plaintiff–John Hobson, Esq.**
**Defendants–Elizabeth Germani, Esq.**

fees incurred by Cianbro in defending SMR's claims and the attorney's fees Cianbro expended in pursuing its counterclaim.

4. A party seeking an attorney's fee award has "the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley v. Eckerhart,* 461 U.S. 424, 437 (1983), cited in *Poussard v. Commercial Credit Plan Inc.,* 479 A.2d 881, 885-86 (Me. 1984).

5. SMR argues that Cianbro's attorney fee claim should be denied in its entirety because it contends that Cianbro has redacted so much information in the attached billing records that its application is not properly supported. In making this argument, SMR relies on a decision by Magistrate Judge Rich in *Nationwide Payment Solutions LLC v. Plunkett,* 831 F.Supp.2d 337 (D.Me. 2011).[1]

6. However, it does not follow from the *Nationwide* decision that a fee request with redactions for privileged information should be denied in its entirety. Magistrate Judge Rich ruled that substantial redactions in billing invoices may impede meaningful judicial review. That leaves the party seeking attorney's fees with the alternative of submitting unredacted invoices, allowing those to reviewed by opposing counsel, or of preserving its claim of privilege and choosing

> to take the risk that the court will decline to award the full requested amount on the basis of [the party's] failure to meet its burden of justifying its fee request.

831 F.Supp.2d at 339. The latter alternative is the risk that Cianbro has chosen to take in this case.

---

[1] Although this was a recommended decision, it does not appear that any objections were filed. Magistrate Judge Rich's subsequent award of attorney's fees in the *Nationwide* case was approved without objection. *See* 2012 U.S. Dist. LEXIS 7964 (D. Me. Jan . 24, 2012); 2012 U.S. Dist. LEXIS 18893 (D. Me. February 15, 2012).

7. The court finds that some of Cianbro's billing entries are insufficient to allow the court to determine whether the time spent was reasonable and requires a modest reduction of the attorney's fees requested. For this reason, the court finds that Cianbro's attorney's fees request should be reduced by $10,000. However, no reduction is appropriate with respect to other attorney-client and work product redactions when it is evident from their context that the redacted entries involved witness preparation, keeping the client informed of developments in the case, and inquiries to the client with respect to discovery and other issues.

8. There is no doubt that Cianbro was required to incur substantial attorney time in connection with the litigation of this case. This included initial proceedings (including a court hearing on connection with SMR's lien filing and the substitution of a bond), document production, preparation for and attendance at depositions, two discovery conferences, a judicial settlement conference, trial preparation, a five-day trial, and lengthy post-trial briefing. The court is aware of the complexity of the document production involved from the discovery conferences, and the complexity of the factual issues presented at trial is demonstrated by the multiplicity of exhibits and the court's 23-page, 84 paragraph decision. Except for the modest deductions referred to above, the court finds the time spent on all the above tasks to be reasonable.

9. SMR does not challenge the hourly rates sought for Cianbro's attorneys, which the court finds to be reasonable. The court also finds, given the complexity of the case and the number of exhibits, that it was not unreasonable for Cianbro's counsel to staff this case with a partner and an associate and for both to attend trial even though SMR only had one attorney at trial.

10. Cianbro is accordingly entitled to attorney's fees totaling $115,935.00.

3

11. Cianbro is also seeking costs of $32,369.13. These costs include but are not limited to the costs that would be available to a prevailing party under Rule 54(d) because the SMR subcontract provides that upon prevailing Cianbro is entitled to recover "attorney's fees, other legal fees, expert fees, court costs, [and] all expenses of litigation . . . reasonably incurred in connection with any dispute with the Subcontractor." Plaintiff's Ex. 1, Subcontract § 20.7.

12. Of the $32,369.13 in costs sought by Cianbro, SMR objects to items totaling $19,135.58. These consist of a $1,232.08 copying fee for emails, a $7,000 conversion fee to convert emails from native to TIFF format, and $10,903.50 in expenses for Cianbro's expert witness.

13. The court does not uphold SMR's objections to the costs of copying and converting emails.

14. The expert witness costs are in a different category. Counsel for SMR was successful in impeaching Mr. Kellar – to the point where the court did not rely on Mr. Kellar's testimony except where that was supported by other evidence. However, the court did not disregard that testimony entirely. Accordingly, the court will reduce the costs sought for Mr. Kellar's expenses to $3,600.

The entry shall be:

1. Pursuant to the Subcontract, defendant Cianbro Corporation shall recover attorney's fees of $115,935.00 against plaintiff SMR.

2. Defendant Cianbro Corporation shall recover litigation costs pursuant to § 20.7 of the Subcontract in the amount of $25,065.63.

3. Accordingly, judgment shall enter in favor of defendant Cianbro Corporation and against plaintiff SMR Inc. in the amount of $ 162,200.63, representing $21,200.00 in damages set forth in the November 7, 2019 order plus the attorney's fees and litigation costs set forth above. Pre-judgment interest shall apply at 3.87%. Post-judgment interest shall run at 7.53%.

4

4. The clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: March _5_, 2020

_____

Thomas D. Warren
Justice, Superior Court

_ME/_

Entered on the Docket: _03/09/2020_.

5

STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. RE-17-219

SMR, INC.,

       Plaintiff

v.

       ORDER

CIANBRO CORP., et al.,

       Defendants

**Plaintiff–John Hobson, Esq.
Defendants–Elizabeth Germani, Esq.**

Before the court is an application by defendant Cianbro Corporation for attorney's fees and costs. The court is prepared to rule on that application but will first address Cianbro's motion to submit its attorney's fee affidavit and the redacted billing records attached to that affidavit under seal.

Plaintiff SMR Inc., which was served with copies of the documents that Cianbro seeks to submit under seal, opposes Cianbro's attorney's fees application but has not opposed Cianbro's motion to submit the affidavit and billing records under seal.

However, even if the parties agree, the court is not willing to remove the materials that form the basis for the court's ruling from the public record. Cianbro relies on the affidavit and the attached billing records to support its application for attorney's fees.

Court proceedings are presumptively open to the public, and with the exception of discovery materials, that presumption applies to motions as well as hearings and trials. This is particularly true of documents on which the court relies in determining litigants' substantive rights. *FTC v. Standard Financial Management*, 830 F.2d 404, 408 & n.4 (1st Cir 1987). 'The principle that court proceedings are open to the public is a fundamental tenet of our judicial system, protected by both the common law and the First Amendment. *See, e.g., Nixon v. Warner Communications*, 435 U.S. 589, 597 (1978); *Lugosch v. Pyramid Co.*, 435 F.3d 110, 119-21 (2d Cir. 2006); *FTC v. Standard Financial Management*, 830 F.2d at 408; *Publicker Industries v.*

*Cohen,* 733 F.2d 1059, 1066 (3d Cir. 1984). The court does not believe that it should make decisions on a secret record or a record from which crucial portions have been withheld from public access unless a party seeking confidentiality can demonstrate strong countervailing interests.

Cianbro has not demonstrated a sufficiently strong confidentiality interest to overcome the presumption of public access in this case. It argues that the information in the billing records is confidential and privileged, but it has redacted all of the portions of the billing records that would disclose attorney-client communications.[1]

Accordingly, the motion to seal is denied and the affidavit and attached records shall be placed in the public court file.

The entry shall be:

Defendant's motion to seal its attorney's fee affidavit and attached billing records is denied.. The clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: March _3_, 2020

Thomas D. Warren
Justice, Superior Court

Entered on the Docket: _03/05/2020_

mc

REC'D CUMB CLERKS OFC
MAR 4 '20 AM8:58

---

[1] In fact, counsel for SMR argues that Cianbro has redacted so much information that it has failed to show that the attorney's fees sought are reasonable.

2

STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. RE-17-219

SMR, INC.,

Plaintiff

v.

CIANBRO CORP., et al.,

Defendants

ORDER

STATE OF MAINE
Cumberland ss, Clerk's Office

NOV 07 2019 11:25

RECEIVED AM

In this action plaintiff SMR Inc. claims that defendant Cianbro Corp. failed to pay SMR monies due under a subcontract providing for SMR to install siding and membrane roofing as part of a larger project in which Cianbro was the general contractor for the demolition and renovation of a portion of the Sappi papermill in Westbrook, Maine.

SMR has asserted claims for breach of contract, enforcement of a mechanics lien, and violations of the Prompt Payment Act, 10 M.R.S. § 1114. Because SMR's claims are based on an express contract, the court previously dismissed claims for unjust enrichment and quantum meruit.

Cianbro has denied SMR's claims and asserted a counterclaim alleging that SMR defaulted on its contractual obligations and seeking damages representing the amount it had to pay to other subcontractors to complete the work after it terminated the SMR subcontract.

A jury-waived trial was held on June 17-21, 2019 and the parties thereafter filed post-trial submissions.[1]

---

[1] In order to consider the parties' proposed findings of fact, the court ordered transcripts of the trial. As it has informed the parties, it found a number of what it believes to be errors on the transcripts from June 19, June 20, and June 21. None of those possible errors affect the court's findings or conclusions, but the court understands that the transcripts are now being reviewed by the court's Office of Transcript Operations.

The court issues the following findings of fact and conclusions of law:

1. In early 2016 Cianbro entered into a contract with Sappi North America to demolish and remodel a portion of the Sappi paper mill in Westbrook. Specifically, the contract called for Cianbro to demolish the existing roof over the portion of the Sappi mill known as Building 37, leaving three existing walls standing (referred to as the west, north, and east walls) and an opening to the south.

2. Once the roof had been demolished, the east and west walls were to be replaced by new steel structural frame walls. The north wall was brick and was to remain in place. On the lower half of the north wall a new structural steel wall was to be built approximately fourteen feet out from the existing brick wall, with a sloping shed roof running back to the brick wall.

3. The new structural steel walls and the existing top half of the north wall were to be covered with insulated steel siding. The existing Building 37 floor (which covered a basement area) was to be covered with a membrane roof.

4. Cianbro's contract with Sappi also called for the building of a small addition (the "employee entrance') at the south end of the east wall. Finally, there was a smaller roof area over the East Wall that was also to be covered with a membrane roof.

5. On May 25, 2016 after considering various bids from other potential subcontractors, Cianbro entered into a subcontract with SMR under which SMR was to furnish and install the insulated steel siding on the west, north, and east walls and the employee entrance area and was to furnish and install a membrane roof on the existing floor and on the area over the east wall. The contract also contemplated some repair work on the west wall roof.

6. SMR's bid was for a total of $ 500,124.00, which was almost $ 500,000 below the next lowest bid. Before the SMR subcontract was let, Rick Bartucca of Cianbro met with Steve

2

McBrady, the owner and chief executive of SMR at the site. The demolition of the Building 37 roof was complete or almost complete at that time, and Bartucca gave McBrady an opportunity – now that the existing walls and the work to be done were more visible – to verify that his bid prices were still good. After a cursory look from the construction trailer, McBrady said he was "all set."

7. Plaintiff's Ex. 1 consists of both the SMR subcontract and a subcontract purchase order. Although the subcontract and subcontract purchase order were signed on May 25, 2016, the purchase order included language that the subcontract was to be performed during the time period from May 10 to July 31, 2016. That time period had been overtaken by events. Cianbro's work had been delayed for various reasons, and at the time the subcontract and purchase order were signed, both Cianbro and SMR understood that the time period set forth in the purchase order was inoperative.[2]

8. Cianbro's standard subcontract form, used in this case, also potentially included a "Project Schedule" as Exhibit D. The SMR subcontract, however, included a notation that Exhibit D was "not used."

9. Before he even signed the subcontract, Steve McBrady had informed Cianbro that SMR was committed to certain school projects throughout the summer of 2016, and the parties understood that the siding work would begin in the early fall.[3] This suited both parties because Cianbro had experienced a number of problems and delays on the job at that time and had not yet installed the structural steel necessary for SMR to hang the insulated steel siding.

---

[2] The SMR subcontract and the Sappi contract both refer to two phases of work, but McBrady of SMR knew prior to signing the subcontract that the work was to be performed in a single phase. The subcontract provided that Cianbro could order the work to be done in a different sequence or at different times than those set forth in the Subcontract Purchase order so long as it did not shorten the duration of the subcontract work. Plaintiff's Ex. 1 § 5.1.

[3] See May 23, 2016 McBrady email in Plaintiff's Ex. 17; Defendant's Ex. 11.

3

10. SMR contends that Cianbro violated 10 M.R.S. §1114(2) by not disclosing the due dates for Cianbro's receipt of payments from Sappi before the contract was entered. However, the subcontract documents expressly included the prime contract, noted as available on request. Plaintiff's Ex. 1 § 1.11(j). The prime contract specified when Cianbro would be paid. Defendant's Ex. 2 § 10(b). This constituted adequate disclosure. Moreover, in entering the subcontract, SMR expressly represented and warranted that prior to entering the subcontract it had carefully examined the subcontract documents. Plaintiff's Ex. 1. § 2.2(a). As the court found at trial, there was no violation of 10 M.R.S. § 1114(2).

11. Cianbro expected that SMR would order the siding so that it could begin work after Labor Day and was surprised and concerned when, in an email on September 6, 2016, Steve McBrady asked what color siding should be ordered. This indicated that the siding had not been ordered. In a September 7 email Gary Parker of Cianbro responded, informed McBrady the color that had been chosen by Sappi, and added, "I need to know reality on lead time for the siding."

12. McBrady answered by email that he would "call in color and get you a time." Parker responded almost immediately, asking McBrady if he knew the quantities he needed and whether he would get a lead time that day.

13. Parker then sent an email on the following day, Thursday September 8, stating:

> Steve:
> Do you have a lead time for the siding and is the color that the owner pick readily accessible? How many sq. ft. of siding have you ordered? When will you have a crew here to start the Roof and what do you need from use [sic] to get started? I don't want your guys waiting around for us to do something that I may have missed. Remember I think you should be able to start end of next week.

Defendant's Ex. 15.

4

14. When McBrady did not respond, Parker sent a further email on Monday September 12, attaching his earlier email and stating:

> Steve:
> Please respond to these Question right away It is important.

*Id.*

15. McBrady responded by email on Thursday September 15, apologizing for the delay in responding and stating that he had been waiting for the siding manufacturer (Kingspan) to give him an accurate estimate. His email went on to state:

> The wall panels ship from Florida and have an estimated arrival date of 10/15/16. The roof panels ship from California and have an estimated arrival date of 10/25/16.
> These dates assume that there are no issues in trucking . . . .
> They will be able to firm up the delivery dates as they get closer.

Defendant's Ex. 17.

16. Cianbro responded the same day with an email asking McBrady how long it would take him to complete the work and a second email asking, "How many Sq. feet of siding have you ordered?" and when McBrady could start on the west wall roof repair.

17. McBrady did not respond to Cianbro's inquiry as to how long it would take SMR to complete the work.

18. On the quantity issue, McBrady responded (email on September 15 at 3:44 pm), "We have @15000 sq ft of wall panel and 3000 sq ft of roof panel," adding that he would stop by Monday to go over the roofing with Gary Parker.

19. These email exchanges are quoted in some detail because, contrary to McBrady's testimony at trial, his responses to Cianbro represented that he had ordered the siding and roofing panels and that those were estimated to arrive on October 15 and 25, 2016. Although McBrady testified he had been providing a hypothetical lead time, his email is not worded as a

5

hypothetical. McBrady's listing of quantities in response to the question "How many Sq. feet of siding have you ordered?" (emphasis added) also demonstrates that he intended Cianbro to think that he had placed the order.

20. In fact, McBrady did not place the order for siding until a month after his September 15 email.[4]

21. SMR contends that McBrady could not have ordered the siding panels any earlier because he did not receive fabrication drawings (also referred to as shop drawings) from Cianbro until mid-October. However, the court credits testimony that the fabrication drawings were not necessary and that siding could have been ordered earlier. The original contract drawings had been subject to revisions,[5] and there was evidence that even the revisions had some flaws, but the court finds that it is more likely than not that SMR could nevertheless have ordered the siding panels long before it did. If SMR had actually needed the fabrication drawings to order the siding, McBrady would have said that to Cianbro – instead of falsely representing that he had ordered the siding in September.

22. Although Cianbro's installation of the structural steel on which the siding was to be placed had been delayed, the west wall and at least part of the north wall were ready for siding to be installed in early October. Indeed, McBrady admitted in an October 19 email to his supplier that one-half of the project was ready and he could start any time.

23. McBrady's dealings with Cianbro throughout the contract were characterized by repeated failures on his part to respond to Cianbro's inquiries or to appear on the site when he

---

[4] McBrady also did not show up on Monday September 19 to go over the roofing as he had promised in his September 15 email.

[5] Cianbro agreed that the revisions made to the contract drawings justified a change order for an additional sum of $4626. See SMR invoice dated July 6, 2017 (contained in Plaintiff's Ex. 6). McBrady submitted a request for that change order in November but did not receive a response from Cianbro until February.

said he would do so. See, e.g., Defendant's Exs. 22 and 23 (identical emails sent by Gary Parker on October 6 and October 11 asking," Steve when do you think you can have a crew here to start the west wall roof repair and north wall parapet work?" – neither of which elicited a response).

24. On October 17 Parker again emailed to ask, "What's the story on the roofing and is the siding shown up yet." At that time Cianbro was relying on the "estimated arrival date" that McBrady had provided on September 15. Parker's email, sent on October 17 at 3:24pm, appears to have finally caused McBrady to place an order for the siding – on October 17 at 4:03pm. Defendant's Ex. 25.

25. McBrady then sent an email to Cianbro on October 20 stating that he had called the supplier regarding the siding panels and had been told they were running behind due to a hurricane. This was disingenuous at best given that McBrady had only placed the order a few days earlier.

26. On October 20 McBrady emailed (Defendant's Ex. 27) that SMR could start the west wall roof repair the following week, but that did not happen.

27. As of the first week of November Cianbro was attempting to meet with McBrady to get some answers. Calls to his office were unsuccessful, and McBrady's secretary ultimately told Eve Jordan of Cianbro that she should come to McBrady's office early in the morning if she wanted to try to catch him. She did so, and they met on the morning of November 9. At that meeting McBrady informed Cianbro that he now expected the wall and roof panels to be delivered from the supplier during the first week of December. After that meeting Jordan emailed McBrady to state that she expected him to provide an expected work schedule and

duration[6] and that she understood SMR would be onsite to do the west wall roofing repair beginning November 14.

28. McBrady did not provide an expected work schedule but he did respond that afternoon with estimates for the time necessary to install siding on the west, north, and east walls (including the portion of the north wall above the shed roof), which added up to 41 work days.[7] Defendant's Ex. 35. McBrady did not take issue with Jordan's statement that she expected SMR to begin the west wall roofing repair on November 14. Nevertheless SMR did not appear at the site on that date.

29. The siding panels did not arrive during the first week of December.[8] McBrady informed Cianbro on December 9 that he had talked to the supplier and that the siding was being loaded to ship out that day.

30. On December 14 and again on December 21 Cianbro sent more formal letters to McBrady noting the multiple delays to date, noting the lack of responses by McBrady to many of Cianbro's inquiries, and raising the possibility that Cianbro might have to assert a default under the subcontract. On December 21 McBrady responded that the panels would be delivered on December 27 and that SMR would be on site on December 28.

---

[6] As noted above, this had been previously requested on September 15 (see Defendant's Ex. 18), but McBrady had not responded at that time.

[7] McBrady estimated an additional 14 days for siding the employee entrance, and he estimated up to 38 days for the subsequent roofing work, although he noted that the roofing work was an educated guess because he said that the roof conditions were not exactly as the work had been described.

[8] The emails in evidence between McBrady and the supplier indicate that some of the responsibility for the delay between the date McBrady finally ordered the siding in mid-October and its eventual delivery in late December appears to have resulted from McBrady's failure to provide the proper paperwork. However, it appears that at some point the supplier had informed McBrady that SMR could expect to receive the siding during the first week of December, but no siding was delivered until December 27.

8

31. Cianbro responded the following day with an email asking if SMR was planning to bring enough workers to work simultaneously on more than one wall, requesting an updated schedule, and offering to supplement SMR's crews with Cianbro personnel, if necessary to accelerate the work given the delays already experienced.

32. McBrady did not respond to the email, but he met with Gary Parker on December 22 stating he would keep siding at the SMR premises and bring it to the site as needed. He also started that he intended to start with a crew of 3 or 4 workers and a foreman and that SMR could only work on one wall at a time.

33. SMR did arrive on site on December 28 with siding panels and began to hang siding on the west wall on January 3, 2017.[9]

34. At this time the west and north walls had been ready for siding to be installed for some time. Cianbro was still finishing the installation of structural steel on the east wall, which needed to be finished before the east wall siding could be hung. The structural steel on the east wall was approximately 90% complete and although it was not completed until around January 27, Cianbro could have finished that work sooner if SMR had finished the other walls and had wanted to hang siding on the east wall.

35. In fact, SMR experienced delays in hanging siding on the top half of the north wall because the condition of the wall in that area was too soft to hold some of the siding fasteners. It took approximately a week for an engineering solution for that issue to be approved by Sappi, and Pat McBrady (Steve McBrady's brother) asked Cianbro to finish the east wall in the meantime. Pat McBrady testified that the SMR crews were not forced to wait because of the north wall issue because they had other work to do.

---

[9] Defendant's Ex. 62 indicates that two SMR employees also were on site on December 21 and 22 and one SMR employee was on site on December 27, apparently doing some preparatory work.

9

36. Steve McBrady never responded to Cianbro's request for an updated schedule and did not follow up on Cianbro's offer to supplement his crews. He had told Cianbro in December that he planned to work with three or four workers plus a foreman, but at trial he testified that the optimum crew size for the siding work would have been three workers plus a crane operator. While SMR had a crew of three workers on the site on most days during the first three weeks of January (and worked some Saturdays), the crew size dropped to two during the last week of January, varied between two and three workers during February, and was very rarely more than two workers (and occasionally only one worker) after the first week of March. There were also some days when no SMR workers were on site.

37. There is no claim in this case and no evidence was offered that there were any deficiencies in the quality of SMR's workmanship in hanging the siding. What is disputed is whether SMR's job progress was satisfactory.

38. The relevant terms addressing payment under the subcontract were that SMR was to be paid "for satisfactory completion of its obligations" under the subcontract within 7 days of the date that Cianbro received payment from Sappi for the work in question. Plaintiff's Ex. 1 (Subcontract) §§ 4.3, 4.7. This is a standard "pay when paid" provision. The payments were to be paid monthly for the work performed through the last day of the preceding month, less retainage. *Id.*

39. SMR initially sent Cianbro an invoice dated January 19, 2017 for $140,000, which included $64,000 for installing siding and $76,000 for metal siding stored in SMR's yard. However, this invoice was premature because SMR had not installed any siding as of the last day of December 2016. Moreover, the subcontract provided that SMR could be paid for storage of materials only if SMR had obtained advance approval. Plaintiff's Ex. 1 § 4.5 (a). Cianbro had

expected the materials would be brought to the site and never approved a proposal to pay SMR for materials stored off site. Cianbro did not object when McBrady told Gary Parker in late December that his plan was to keep the siding off-site and bring it as needed, but that did not constitute an agreement to pay for off-site storage.

40. SMR thereafter submitted a second invoice dated February 23, 2017 in the amount of $40,000 for installing siding.

41. It is not clear from the record when exactly those invoices were received by Cianbro. Emails in the record indicate that the first invoice had at least been received by February 3, 2017 and the second invoice had at least been received by March 2, 2017. In both cases payment was not due under the contract because Cianbro had not received payment from Sappi for any siding work.

42. Cianbro received payment from Sappi for work included in SMR's January invoice on March 29, 2017.[10] Cianbro received payment from Sappi for work included in SMR's February invoice on April 24, 2017.

43. Cianbro emails indicate that Cianbro was prepared to approve SMR's first invoice in early February – even though Cianbro had not yet been paid by Sappi for that work – to avoid any slowdown in the work on site. It appears, however, that payment of the first invoice stalled somewhere in the Cianbro bureaucracy and did not get issued at that time.

---

[10] There was originally a dispute between the parties as to the dates Cianbro received payments from Sappi, which would have triggered the 7 day "pay when paid" requirement. This is because Sappi's payments were made according to a schedule of values (essentially benchmarks) that included "start east siding wall," "start north siding wall," and "start west siding wall." However, there were no listed benchmarks for "finish" siding on those walls. When Cianbro received a payment because the benchmark "start east siding wall" had been reached, it was not being paid for having completed the siding on that wall.

In its proposed findings of fact submitted after trial, SMR has accepted that Cianbro was paid by Sappi for the work in SMR's January invoice on March 29, 2017 and for the work in SMR's February invoice on April 24, 2017. Plaintiff's Proposed Findings of Fact ¶¶ 102, 106.

11

44. Cianbro emails demonstrate that when SMR's second invoice was received, Mike Hilton of Cianbro decided that Cianbro should hold up that payment. The reason for putting a hold on the payment was Cianbro's concern that SMR was not making satisfactory progress. Although SMR was then installing siding, it had not started working until January and not taken any measures over the winter to accelerate its work. In addition, Cianbro had requested but had not received from SMR any definitive time frames for the roofing portion of the project.

45. At this point Steve McBrady was continuing to be non-responsive (as stated in an email from Gary Parker, "he will not communicate"), and Cianbro had for some time been considering back-charging SMR for increased costs, including those that Cianbro had incurred because of the need to winterize portions of the mill due to the delay in installing siding. There was also a significant possibility that Cianbro would have to pay for another subcontractor to finish the job. In an email on March 2 Gary Parker suggested withholding $200,000 – a figure that he acknowledged he had pulled from the air but that was ultimately $185,000 less than Cianbro had to pay other subcontractors to finish the work after SMR's subcontract was eventually terminated. At that point, payment for SMR's first two invoices was not yet due under the contract. Mike Hilton of Cianbro testified that he decided to withhold payment of the invoices received from SMR (after the first SMR invoice) because he wanted to hold back enough money so that Cianbro could complete the job with other subcontractors if SMR's progress continued to be unsatisfactory.

46. McBrady testified that he began complaining to Gary Parker about the lack of payment in March, although there are no emails to that effect. SMR submitted another invoice dated March 17, 2017 for siding work totaling $51,200. The record does not reflect when this

12

invoice was received by Cianbro, but there does not appear to be any dispute that Cianbro was paid by Sappi on June 1, 2017 for the work invoiced by SMR on March 17.

47. SMR finished hanging the siding panels on the west, north, and east walls sometime around March 17, 2017. At that point SMR had already been working on installing siding on those walls for approximately 57 work days – as opposed to the 41 days set forth in McBrady's November 9 estimate (Defendant's Ex. 35). Moreover, SMR had not yet completed the siding work because it had not installed flashing and wall cap above the siding that had been hung.

48. The other work that remained to be done at that time was the siding of the employee entrance – on which, through no fault of SMR, Cianbro was still installing structural steel – and the roofing portion of the job. McBrady never ordered any of the roofing materials.

49. Around the end of March Cianbro managers had learned that payment of SMR's first invoice, which they had been prepared to approve in February, had not gone out. Gary Parker of Cianbro recognized that the inadvertent bureaucratic delay of that payment would adversely affect SMR. *See* Plaintiff's Ex. 51 ("We don't really need to make an effort to jerk people around it just comes naturally by the look of this").

50. Because Cianbro received payment from Sappi on March 29 for the siding work in SMR's January invoice, payment to SMR would ordinarily have been due 7 days later. Around that time Pat McBrady told Gary Parker that his brother was planning to come in and meet to discuss the status of payment. Cianbro emails demonstrate that if such a meeting occurred, Cianbro wanted to obtain a roofing plan from SMR. Defendant's Ex. 52. At this time Cianbro was planning to withhold payments other than SMR's first invoice – both to await the outcome of discussions with McBrady and because it was not satisfied with SMR's progress on the job.

13

51. Based on what Pat McBrady had said, Cianbro expected Steve McBrady to come in for a meeting about payment. However, as might have been predicted based on prior experience, Steve McBrady did not appear for such a meeting. On April 4 Mike Hilton of Cianbro sent McBrady an email stating that Cianbro would be releasing payment on the first invoice but would not release further payments "until there has been a concentrated effort on the roofing portion of the job" and noting that the continued delay by SMR was impacting project completion.

52. Under the subcontract, Cianbro, as the contractor, was entitled to "withhold payment . . . to such extent as may be necessary in Contractor's opinion to protect Contractor from actual or potential loss directly or indirectly relating to the Subcontractor or any act or omission of the Subcontractor, including, but not limited to, unsatisfactory job progress . . . ." Plaintiff's Ex. 1 § 4.10 (emphasis added).

53. Cianbro was justified in withholding payment of SMR's February and subsequent invoices based on unsatisfactory job progress under § 4.10 of the subcontract for the following reasons: (1) McBrady's misleading representations on when siding had been ordered – which had corroded Cianbro's trust in statements made by McBrady, (2) SMR's delay in ordering siding, (3) SMR's failure to begin hanging any siding until January 2017, (4) the lack of any attempt by SMR to accelerate the progress of its work, (5) SMR's failure to have what McBrady described as the optimum crew size in February and March, (6) McBrady's consistent and almost inexplicable non-responsiveness, and (7) the 57 days it had taken SMR to install siding on the west, north, and east walls – 16 days more than McBrady's 41 day estimate even disregarding the additional time subsequently required for the associated flashing and wall cap work.

14

54. As a result, Cianbro is not liable on SMR's claims for breach of contract. Similarly, it is not liable for violation of 10 M.R.S. § 1114(1). That section provides that a contractor shall pay a subcontractor "strictly in accordance with the terms of [the contract]." As noted above, Cianbro was acting within the terms of the contract in withholding payment for unsatisfactory job progress. Moreover, Cianbro had a good faith claim, based on SMR's non-responsiveness and SMR's unsatisfactory job progress, that if SMR's performance did not improve, Cianbro would have to pay for other subcontractors to complete SMR's work. *See* 10 M.R.S. § 1118(1) ("Nothing in this chapter prevents an owner, contractor, or subcontractor from withholding payment in whole or in part under a construction contract in an amount equaling the value of any good faith claims . . ., including claims arising from unsatisfactory job progress").

55. The release of payment for the first invoice did not result in a direct payment of the full invoice to SMR because around that same time Sappi and Cianbro had learned that SMR's supplier (Kingspan), which had not yet been paid for the siding by SMR, was about to place a lien on the job. Under the subcontract it was SMR's responsibility to pay its suppliers. Plaintiff's Ex. 1 § 4.11. It was also SMR's responsibility to remove and discharge any liens *Id.* § 4.15. However, McBrady acknowledged at trial that he had actually suggested to Kingspan that Kingspan should place a lien on the job. He did so even though under the subcontract this constituted an event of default by SMR. *See id.* § 16.1(c).

56. Pursuant to the subcontract Cianbro had the right to deduct any amounts paid to discharge a lien or claim from sums otherwise payable to SMR. Plaintiff's Ex. 1 § 4.15; *see id.* § 4.12. Accordingly, to prevent Kingspan from filing a lien, Cianbro issued a joint check to SMR and Kingspan for $101,812.79 – the amount necessary to pay off Kingspan – and another check to SMR for $31,187.21. This covered SMR's first invoice minus retainage.

15

57. At this point SMR was still on site doing flashing and wall cap work to complete the siding job on the west, north, and east walls and was also hanging siding on the employee entrance, on which Cianbro was still finishing structural steel work. In mid-April, however, SMR stopped coming to the site, saying that it had run out of flat stock for the final portions of the flashing and wall cap and was awaiting more from Kingspan. In fact, the flat stock could have been obtained locally, and the real issue was that SMR and Cianbro were reaching an impasse over payment.

58. On May 3, 2017 Gary Parker emailed McBrady asking when SMR could finish the work on the parapet and remove the lifts. He asked McBrady if he had a schedule for completion of the siding and flashing and for the roofing segment of the subcontract.

59. McBrady did not respond until May 11, when he sent an email stating that he expected to receive the flat stock that week but that Cianbro's payments were overdue and he was not going to invest any more money until the account was current.

60. Parker responded by email the following day, reiterating Cianbro's position that SMR would receive further payments when it placed a sufficient crew on the job to get it completed in a timely fashion. He added that Cianbro wanted to get together with McBrady to work out "a path forward that would be acceptable to us all" and was willing to meet on 24 hours notice. This email does not appear to have elicited any response.

61. On June 5, 2017 McBrady reported that SMR had finally received the flat stock necessary to finish the siding portion of the job and that SMR intended to finish the siding portion of the job in the next several weeks. However, he stated that he was unwilling to order roofing material until Cianbro had paid his prior invoices.

16

62. Mike Hilton of Cianbro responded on June 6 again requesting a meeting to work out a "path forward" satisfactory to both parties. This was almost a month after Gary Parker had first requested a meeting with McBrady.

63. Receiving no response, Hilton sent a further email two days later on June 8 outlining a proposal for the completion of the job. He offered to release the $40,000 sought in SMR's second invoice if the siding work was finished up in two weeks as McBrady had promised. Hilton further proposed that if SMR ordered the roofing materials, Cianbro would pay SMR for those materials when they were delivered to the site and that once SMR came on site with a reasonable sized roofing crew, Cianbro would begin paying SMR's other invoices and would stay current thereafter.

64. McBrady responded the following day saying that he would make himself available for a meeting but reiterating his position that Cianbro's payments were past due and that he was not willing to spend any additional money until the account was current.

65. McBrady finally met with Hilton and Mike Reed of Cianbro on June 14 or 15, 2017, but that meeting did not result in any agreement on a path forward. McBrady's position remained that he was not going to do any further work until he received payment for his previous invoices. Cianbro's position remained that it was not prepared to release further money absent a showing of progress by SMR on the job. At that point SMR had not made more than a handful of appearances on site since late April.

66. On June 16, 2017 Cianbro sent a letter to SMR stating that SMR was in default under § 16.1(b) of the subcontract, referring to a "failure to complete the work within the schedule established by the Contractor" and that the "Subcontract Work is no longer capable of being performed in accordance with the schedule established by the Subcontract Document." Plaintiff's

17

Ex. 61. That letter further advised that Cianbro intended to terminate the subcontract unless SMR cured the default within 24 hours.

67. On June 20, 2017 Cianbro sent a further letter stating that "[b]ecause SMR has not completed its work in accordance with the schedule established by the Subcontract Purchase Order ('Subcontract'), Cianbro hereby terminates the Subcontract" and will exercise its remedy of obtaining other subcontractors to complete the project. Plaintiff's Ex. 62.

68. The subcontract provided that if the subcontractor failed to object in writing to a notice of termination within five days, the subcontractor's agreement to all matters stated in that notice "shall be conclusively established." Plaintiff's Ex. 1 § 22.17. SMR did not object in writing to Cianbro's June 20, 2017 notice of termination within five days. As far as the record reflects, SMR took no action until it filed a notice of lien on or about July 18, 2017.

69. Putting § 22.17 of the subcontract aside, if the termination of the subcontract were to be judged based on the literal terms of Cianbro's termination letters – that SMR had not completed its work in accordance with the schedule established by the subcontract or by the contractor – it would be difficult to justify the termination. As noted above, the subcontract did not contain a Project Schedule (Exhibit D), and both parties knew at the time the subcontract was signed that the time period set forth in the subcontract purchase order (May 10 to July 31, 2016) was no longer operative.

70. For a while, Cianbro kept a document setting forth an overall project schedule for the entire Building 37 job. That document, which was aspirational at best, was modified a number of times, and eventually Cianbro ceased updating it. As of the time when the SMR subcontract was signed, that schedule, which had already been previously updated once, indicated that the siding and the east roof portion of the overall Building 37 project would be done from July 18, 2016 to

18

September 5, 2016 and that the membrane roof portion would be done from September 12 to September 26. Defendant's Ex. 4-b. That document was provided to McBrady, but both parties knew that schedule was outdated. The next iteration of the schedule, dated June 28, 2016, showed the siding and east roof portion being performed from August 15 to October 10 overlapping with work on the membrane roof from September 12 to October 3. Defendant's Ex. 4. The final iteration of the schedule, dated September 14, 2016, showed the siding and east roof portion of the Building 37 project starting on September 26 and ending on November 21, with the membrane roof work overlapping from October 17 to November 7. Defendant's Ex. 4-c.

71. There is no evidence that Defendant's Exhibit 4-c — which was an overall Building 37 project schedule rather than a specific SMR subcontract schedule — was ever provided to SMR. Moreover, there is no evidence that Cianbro ever instructed SMR that it had established a specific schedule (either Defendant's Ex. 4-c or otherwise) that SMR would be required to meet.

72. One reason why Eve Jordan did not revise Cianbro's Building 37 project schedule after September 14, 2016 was that she never received a firm date from SMR for the start of SMR's work.

73. The subcontract provided that "Contractor will publish an initial Project Schedule that will be updated periodically (**"Project Schedule"**), **Exhibit D.**" Plaintiff's Ex. 1 § 5.2 (boldface in original). The same provision goes on to state:

> Promptly upon request by Contractor but in no event later than seven (7) days after such request, Subcontractor shall furnish a detailed resource loaded schedule complete with all activities associated with the Subcontract Work demonstrating the Subcontract Work in coordination with and conformance to the Project Schedule.

However, since the subcontract provided that Exhibit D, the Project Schedule, was "not used" and since Cianbro never informed SMR that it had established a specific schedule under the

19

subcontract that it expected SMR to follow, SMR cannot be defaulted for failing to furnish a "detailed resource loaded schedule" conforming with a project schedule that had never been established.

74. It is, however, highly relevant that McBrady never provided any schedule despite a number of urgent requests from Cianbro. The closest he came to providing a schedule was the duration estimate he submitted on November 9, 2016 (Defendant's Ex. 35) – an estimate that SMR failed by a significant margin to meet.

75. Most importantly, as of mid-June 2017 SMR had not done any significant work at the site for approximately two months, and at that time McBrady was declining to do any further work until Cianbro paid SMR's prior invoices – even though Cianbro was justified in withholding payment based on unsatisfactory job progress. The subcontract specified that both a cessation of work and a failure to promptly perform the subcontract work constituted events of default. Plaintiff's Ex. 1 § 16.1(a), (b).

76. The subcontract provided that the subcontractor agreed to commence the work "without delay when progress on the Project had reached a point where Subcontractor's work can commence." Plaintiff's Ex. 1 § 5.1. As noted above, SMR had previously failed to do this when the east and north walls were ready for siding to be hung, and – having not ordered any roofing materials for the final portion of the job – SMR was in no position to promptly commence the final roofing work.

77. Accordingly, Cianbro had an adequate basis to determine that SMR was in default, and even apart from the conclusiveness of Cianbro's notice of termination under § 22.17 of the subcontract, the court would uphold the default notwithstanding the wording of Cianbro's default letters.

20

78. The court reaches this result although it recognizes that Cianbro experienced considerable problems in connection with the Building 37 project that were not attributable either to SMR's belated appearance on site, to SMR's slow progress once it finally began work, or to McBrady's non-responsiveness. Although the Building 37 project had been significantly delayed for reasons for which SMR was not responsible, that did not excuse SMR's laggard performance and its decision to cease work when Cianbro had a valid reason to withhold payment based on SMR's unsatisfactory job progress. Even then, this litigation and the consequent damages could have been avoided if SMR had not ceased performance, had agreed to order roofing materials (for which Cianbro would have paid) and had put a crew on site to accelerate the roofing work.

79. In order to complete the work that SMR had contracted to perform, Cianbro paid $28,880 to Northeastern Insulation Services (NIS) to have the remainder of the siding work done – the wall cap and flashing that had not been finished and the completion of siding on the employee entrance.

80. To perform the roofing portion of SMR's work, Cianbro paid $359,444 to Industrial Roofing Company (IRC).

81. Upon SMR's default, Cianbro had the right under the subcontract to contract with NIS and IRC to perform the work that SMR had not completed and to seek damages from SMR for any costs or damages incurred as a result of SMR's default. Plaintiff's Ex. 1 §§ 16.2(b), 16.2(f), 19.4. In this case, the loss incurred by Cianbro in having other subcontractors take over SMR's work consisted of $21,200 – the total amount paid to NIS and IRC ($388,324) minus the

amount that Cianbro had not yet paid on SMR's contract at the time that contract was terminated ($367,124).[11]

82. Based on its post-trial submissions Cianbro is also seeking additional damages of approximately $35,840 representing additional expenses that it incurred based on SMR's alleged deficiencies. While the court does not doubt that Cianbro incurred some extra expenses beyond its payments to NIS and IRC, the evidence at trial demonstrated that some of the expenses sought by Cianbro would have been incurred because of Cianbro's own delay, some are not properly recoverable,[12] and some, although listed on Defendant's Exs. 65 and 66, were not supported by other evidence. The court cannot reliably determine any additional damages beyond the $21,200 amount stated above.

83. In reaching the above findings and conclusions, the court has assigned the burden of proof by a preponderance of the evidence to SMR on its claims against Cianbro and the burden of proof by a preponderance to Cianbro on its counterclaim against SMR. Even if it were assumed that Cianbro had the burden of demonstrating that it was entitled to withhold payment based on unsatisfactory job progress and that it had a good faith basis to withhold payment, the court would find that Cianbro met that burden.

84. Accordingly, Cianbro shall be awarded contract damages of $21,200. Under the subcontract, Cianbro is also entitled to its attorney's fees and costs. Plaintiff's Ex. 1 §§ 16.2(f), 19.4. Accordingly, Cianbro shall have 21 days to submit an application for attorney's fees and

---

[11] This means that although SMR was not paid for the majority of the siding work for which it had submitted invoices and which it had performed (albeit belatedly, slowly, and incompletely), the money that was withheld by Cianbro substantially lessened Cianbro's claim for damages against SMR based on the amounts Cianbro paid other subcontractors to complete the job.

[12] By way of example, Cianbro's claim for the additional costs it incurred apparently includes supervision costs for Friday work, but the subcontract allowed SMR to work on Fridays.

costs with appropriate affidavits and billing records necessary to support that application. SMR shall have 21 days in which to respond.

The entry shall be:

1. Judgment shall be entered against plaintiff SMR Inc. and in favor of defendant Cianbro Corporation on the claims asserted in plaintiff's complaint.

2. The release of mechanic's lien bond No. 012026625 issued by Liberty Mutual Insurance Co. is released and discharged. Judgment is rendered in favor of Liberty Mutual Insurance Co. and the said bond is hereby dissolved.

3. Judgment in the amount of $21,200 shall be entered in favor of Cianbro Corporation and against SMR Inc. on the claims asserted in Cianbro's counterclaim.

4. Defendant shall have 21 days from the date of this order in which to submit an application for attorney's fees and costs and plaintiff shall thereafter have 21 days in which to oppose that application.

5. The clerk shall incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: November _7_, 2019

Thomas D. Warren
Justice, Superior Court

Entered on the Docket: 11/08/19

Plaintiff-John Hobson, Esq.
Defendant-Elizabeth Germani, Esq.

23